Good morning, your honors. My name is Jonathan Kane. I'm representing Universal Service Administrative Company, the appellate in this case. The issue that I'd like to spend some time talking about this morning is twofold. The first is whether this court's definition of a transferee, as that term is used in Section 550A of Title 11 of the Bankruptcy Code, remains a law of this circuit. Because if it is, the undisputed facts in this case necessarily result in sustaining the bankruptcy court's decision that Universal Service Administrative Company, or USAC, cannot be held liable for the return  of a transferee. The Bankruptcy Appellate Panel recognized that tacitly because it simply said, we're not going to apply the test, the dominion test, that this court has established. Why don't you start by telling us what you think our established definition of an initial transferee is. Are you going back to bullion, or what do you? Tell us what you think it is and how you think that the VAP varied from it. This court has articulated the standard in both Denny v. Miller Bullion Reserve and in Abell v. Modern Financial Plans and Ray Cohn as the right of the recipient of the funds to use the money for its own purposes. It's a little more than that. It says right of legal control or dominion, doesn't it? There is some confusion about failing to make a distinction that this court has traditionally made between a dominion test and a control test. Well, it does use the term legal control. Can we agree on that? It uses the term legal control. But it also says it's more than simple legal control. It is also the right to put the money to the putative transfer. To gamble, or to invest, or do whatever one wants with it. Lottery tickets or uranium stocks. Which they picked up from, I think, Judge Easterbrook. That's correct. That's right. Wrote fulsomely on this issue. That standard, the one that's been articulated in Bullion Reserve and in Ray Cohn, has been standard in this circuit since 1991. And it is precisely that standard that the Bankruptcy Appellate Panel recognized, as I say tacitly because they've been expressly say so. But the only way they could avoid sustaining the bankruptcy court, Judge Ryan's decision that USAT could not be held liable, was to say that we don't need to apply the test here because this is not, quote, a conduit case. I sort of read them as saying, as we apply it, the conclusion is that they're not simply a conduit. I think they went beyond that, Your Honor, because they said the fundamental analysis, in this case, of whether a person is a transferee does not require a determination of dominion or control. And said in a footnote that because this is not a conduit case, the court's definition of a transferee is immaterial. They used that terminology. The Bankruptcy Appellate Panel simply said that because we have decided, by looking at the facts, that this is not a conduit case, we don't have to apply the test, which this court has established, to make the determination as to whether a party is a transferee or not a transferee. The panel said this dominion test is not a screening mechanism. In fact, that's exactly what it is. It is this court's definition of a transferee. And if you meet the terms of the definition, if you have the right to put the money to your own purposes, you have the right to invest in uranium stocks or lottery tickets, then you are a transferee. And if you don't have those rights, you're not a transferee. But we can start from this proposition, can't we, counsel, that USAC does have legal control of the, has legal title to the funds, isn't that right? That's absolutely correct. They have legal title to the funds. And this court has made a distinction, as has the Seventh Circuit that was the antecedent, or the precedent, excuse me, of the standard applied here, is that mere possession of the funds, the holder of the funds, is not synonymous with being a transferee under SEC. And that would be true, for example, if you were a bank that was holding something in account for somebody else. The bank would not have legal title to the funds, even though it would have possession of the funds. But you conceded that USAC has legal title to the funds. But not the right to use them. But not the right to use them? That's correct. Does somebody else have the right to use them? Doesn't there have to exist somebody who has the right to use them? Ultimately, there is a transferee that has the right to use them. And the parties that have the right to use them are the parties to whom USAC pays out that money. This is, USAC operates. These are elementary schools and hospitals and? No, no, Your Honor, no. Under the regulations that are established by the FCC, the recipients of the funds are telecommunications carriers and other service providers that provide telephone service, internet service, whatever, to, for example, public schools and libraries. It provides money to telephone companies that operate in what are called high-cost areas. Sparsely settled rural areas, Utah, Wyoming, Nevada, where the cost of providing basic dial-tone service to an individual customer is very high. It provides payment subsidies, if you will, to telephone companies to provide service to underprivileged people. So they have basic dial-tone service at a so-called lifeline rate. Well, but they aren't all in the nature of... The fees are assessed against their activities, right? Your Honor, the fees are assessed against carriers. Yes, I'm sorry, against telecommunications. Telecommunications carriers. So they're assessed. They're assessed, it comes into USAC. And then USAC disperses them to? Back out to carriers again, isn't that it? To do what with? To do the things we've just talked about. To provide the subsidy for high-cost area service, to provide the subsidy for the lifeline rate for low-income people, to provide the funding to carriers and service providers, internet service providers, to put computers, internet service in public schools and libraries. Do they have to use the money for those designated purposes? Absolutely, and those are the only purposes that it may be used for. The scheme of regulations that are set forth... I'm sorry, who, the carriers? Yeah. The carriers are. Why? Oh, I see what you're asking me. They can't buy lottery tickets and uranium stocks. There isn't anybody here who can do that, I don't think. Well, actually, I'm sorry, I misunderstood your question. The carriers who receive this money, it goes into the general fund, if you will, of those companies. It is a subsidy to them, just as if... Okay, I'm trying to think of an example. If PacBell, for example, provides lifeline rate service to its customers, it charges its customers their telephone bill, and then on top of that, to make up the difference for the cost of providing that service to people who qualify for the lifeline rate, USAC makes a contribution to PacBell. That goes into PacBell's accounts receivable, just like the money that it gets from its subscribers. So, PacBell does have the right to use that money for its own purposes. It's PacBell's money. Yeah, but it's compensating them for subsidies that they have already provided to, for example, low-income users or elementary schools. It's compensating them for that, yes. So they've had the choice among a variety of options to use that money? They can use it like any other income they get. Right, but it's in compensation for services that they have already provided to somebody else. What they choose to do with the money, they've already spent it, but it's dollar for dollar, presumably, they certainly haven't gotten more on the dollar than they have put out providing services or subsidies to low-income people. Well, there's a formula established in the regulations that determines how much they get. And USAC does the mathematics, does the arithmetic, and makes the disbursements to the recipients based upon those formulas. When USAC receives funds from the providers, such as income net, it goes into a general fund. Where are those funds held? Can those funds be invested? The money that comes into USAC is placed in bank accounts, either cash accounts, or it may be temporarily invested in securities that are backed by US government. Okay, so they can invest in government securities, they can put it in bank accounts, maybe in some kind of a long-term? Actually, most of it is quite short-term. Okay, but it's in USAC's name, right, in these bank accounts? It's not in the name of PACBEL? No, it is in the name of Universal Service. Okay. As I said, they are the legal title holder, they have title to the money while it's in their possession. Just as a trustee, for example, may have title to money,  that's being held while he's acting as the holder. What happens if PACBEL provides this subsidy to low-income users and then does not submit a bill to USAC? The formula- It's PACBEL's problem, isn't it? I beg your pardon? It's PACBEL's problem, isn't it? Well, PACBEL, the way it works, the way the system works is that PACBEL identifies a number of customers that it has that meet certain criteria, and the FCC says if you submit this form, then you get your subsidy. Right, but if they don't submit the form, if they don't file the claim form, they don't get the money. It's not PACBEL's money. Well, it's not USAC's money either. But it's not PACBEL's money. I'm trying to, Mr. King, one of the questions we had here is if USAC is not the transferee, who is, because there has to be somebody here who controls this money. Right, and my answer to that question, Your Honor, is it's the Verizons, the PACBELs, the MCIs, the AT&Ts. They're out there, they get the money. When it comes to them, they have the right to use it for whatever purpose. Is it your condition to use the terms that have been used in some of the other cases that USAC is simply a conduit? USAC is a conduit. That's all it is here. Its job is to collect these contributions, do the arithmetic, and redistribute the money back to carriers. Would a trustee be a mere conduit? I believe a trustee, it depends on the nature of the trust agreement, but a trustee could easily be a mere conduit, absolutely. The BAP seemed to have a misconception, as I think I did, coming in about who gets the money from USAC, because at page 13 of their opinion, 48 of the record, it says, as a practical matter, the transfer cannot be recovered from the beneficiaries of the universal service program after it has been commingled with the other funds in USAC's bank account and distributed to the school's libraries at all. Right. Okay, so with that in mind, you are now saying that they had a factual misconception of who actually receives the money? They have two factual misconceptions. The first is who receives the money, and the second is that this is somehow not a two-step process. All right, so before you do that in your answer, I'd like you to focus on what are in the video case, where I think it was Judge Nelson or one of the cases where in trying to assess who has the, I'm pretty sure it is, it's the check in the, you know, the payoff, the Hilton, isn't that the video? One of the video cases, it's not Cohen. Sorry. Well, in any event, the analysis was looking back in the other direction in terms of who, what is the function or the purpose of the fraudulent conveyance, fraudulent transfer rule, and upon whom should the obligation of initial trustee be, excuse me, initial transferee be placed because that entity has some obligation or some position in any event in the financial scheme of things to monitor and pick up on the idea, on the possibility that the transferor is engaging in a fraudulent transfer. So they look back in the other direction. We've been looking now to see in the sort of the reverse, who gets legal control. But in assessing that, it seems to me that if one looks back to who's getting the money from the telecommunications company, the income net in the first instance, USAC clearly under that kind of analysis would be the entity most logical. Isn't that correct? No, I respectfully disagree. And the reason for that is this. Actually, there's two reasons. The first is, assume for the moment, assume for the moment that the regulation said that USAC collects all the money and then doesn't pay it out to a number of carriers, but pays it to a single entity. That's what the rules say. And also assume for the moment that by the time the committee brings suit against that entity, it's insolvent. It's taken the money that it's collected from USAC and it's frittered it away and it's insolvent. We would not be standing here arguing about whether or not, whether or not the committee could come back against USAC at that point. Because it would be clear, just as it is in the escrow agent cases, that the escrow agent is not the transferee. You have to look to who ultimately gets the money. Let me sharpen my question. It is, I'm sorry, I didn't find it earlier. It's the Video Depot. And this is the part I'm picking up on. It says an initial transferee is exposed to stricter liability than a subsequent transferee because an initial transferee is in the best position to evaluate whether the conveyance is fraudulent, citing bondage. Whereas here a transferee receives funds directly from a debtor, the transferee's capacity to monitor and accordingly its burden to monitor is at its greatest. Now in that case, they held that the Hilton, which was the recipient of this cashier's check, even though it was issued by the cause to be issued and put in the name of the video game by the principal of the video game, they held that the Hilton was the transferee. So applying that kind of analysis, again, why isn't USAC, if we applied that kind of- Evaluation. And I think, and I'd just like to answer this question and I'd like to reserve a couple minutes if I may. That case arises in a fraudulent conveyance circumstance. I think the circumstances, the picture you're developing here may be somewhat different when you're dealing with a fraudulent conveyance. This is a preference case. This is a company that's basically sending out its bills on a monthly basis and getting its payments in on a monthly basis. It has no reason to look back, if you will, at whether or not the conveyance is going to be fraudulent or whether the payment would be a preference. It's sending out its bills and it's taking its money. So I'm not sure that the rationale that was applied in this fraudulent conveyance case is applied here. You can reserve your time. Good morning, Your Honors. Michael Liddell on behalf of the Post-Confirmation Committee of Unsecured Creditors of IncomNet. The critical issue here, Your Honors, is whether or not USAC was the initial transferee. And I submit that what's going on here is that USAC is mixing apples and oranges.  is a USAC transferee is that they are a USAC transferee. Somebody is an initial transferee is whether or not they're the initial recipient of the funds from the debtor. USAC admits that it meets that definition. There is, however, also an equitable affirmative defense that's called the conduit defense. And through that defense, an agent for the debtor or an agent for a third-party recipient who lacks dominion over the funds and who simply facilitated the transfer of the debtor's funds to that third-party recipient is considered the mere conduit and not the transferee. Now, this exception is recognized as the conduit defense in two BAPA opinions cited in our briefs, the In re Dominion case, the In re Montrose case, and as an equitable defense in other cases that are also cited in our brief. Now, as such, USAC bears the burden of proof on the conduit defense. What USAC's doing here is it's trying to merge the dominion test that's used in its conduit defense into the general rule and to apply the conduit cases outside of the conduit context because it can't meet its burden of proof. It cannot meet its burden of proof. What can't it prove? Well, it cannot prove that USAC is the agent for the debtor and it cannot prove that USAC is the agent for any third-party recipient of the debtor's funds. It can't even prove, Your Honors, that it transferred the debtor's funds to any third-party recipient because it commingles the funds into this $4.5 billion universal service fund, which it invests and then it grows, and then as people submit claims, it pays money out from the fund. So it's not a conduit, and that's exactly what the BAP is picking up on and what the BAP picked up on below. You know, appellants open their argument by citing this court's Boolean Reserve case for the proposition that the initial recipient of an avoidable payment is not liable for a return of the payment if the recipient was a, quote, mere conduit of the funds, and that's the problem here. At the most fundamental level, USAC has failed to establish that it acted as a conduit for the funds it received from the debtor, much less a, quote, mere conduit. While it admits receiving the funds, there's no evidence in the record whatsoever that it ever dispersed USAC, or dispersed income net funds, the debtor's funds, to anyone. For all we know, those funds may still be sitting in the universal service fund because USAC commingles all those funds. The only evidence in the record is that USAC received the debtor's funds, that it commingles the money it receives into the $4.5 billion universal service fund, that it invests and grows that money, and that it pays out eligible recipients from the fund. To use a Ninth Circuit BAPS terminology, the record here establishes only a one-step transaction, and that's USAC's receipt of the debtor's money, which satisfies the classic definition and the general rule of an initial transferee. The second necessary step of any conduit defense, the transfer of the debtor's money to a third party or parties, has never been established. As a result, this Dominion test, which is a test that's only been used where one party serves as an agent of the debtor or as an agent of the third party to facilitate specific transfer of funds from the debtor to a third party, never comes into play. And what's interesting, Your Honor, is if you actually look at the Bullion Reserve case, the court never addresses the whole burden of proof issue here, and how the general rule interrelates with this conduit defense, because what happened in Bullion Reserve was the defendant, Defendant Miller, was not, in fact, the initial recipient of the debtor's funds, and in fact, had never had possession of the debtor's funds. In Bullion Reserve, what they were looking at was somebody who was potentially a subsequent transferee. So the court never got to the issue and never had to address the issue of how this Dominion test plays in or doesn't play in when you're not dealing with an initial transferee. Here, by contrast from the Bullion Reserve case, USAC admits that it received the initial transfer of funds from the general, or from the debtor. So the general rule applies, USAC is the initial transferee, unless it can establish the elements that it needs to establish for its conduit defense. Since it can't do that, it's trying to shift those elements to the committee, and that's not appropriate here. The fact is, and this is another distinction from the Bullion Reserve and the Bonded Financial cases, is that both cases, and in fact, all these cases that deal with conduit defenses involve a defendant who was arguably the agent for the debtor, or the agent for the third-party recipient of the debtor's funds. If you look at Bullion Reserve, it involves judiciously reasoning in Bonded Financial, in which a check was made payable to the bank for deposit into the customer's account. Now, the bank there was either the agent for the debtor or the agent for the customer to take that money and put it into the customer's account. It didn't have the right to use that. In essence, the bank was the mere agent for either the payor or the customer in transferring the payor's funds to the bank's customer. As the Bonded Financial court noted, when A gives a check to B as agent for C, then C is the initial transferee. The agent may be disregarded. Here again, Your Honor, by contrast, USAC did not act as the debtor's agent, didn't act as any third-party recipient's agent. If you look at, and I'm not sure if we cited this in our brief, Your Honor, but if you look at the In re Presidential Corp case, which is 180 BR 233, it's a Ninth Circuit BAP opinion from 1995. They said that the relationship between a principal and agent necessarily implies that the principal controls the agent's action and arises only if there's an understanding between the parties that creates a fiduciary relationship. Well, there's no fiduciary relationship here between the debtor and USAC, no fiduciary relationship here between any third-party recipients of the fund and USAC, no ability of the debtor or any third-party recipients of the fund to control USAC. There's no agency relationship here at all. USAC simply collected the money from the debtor and countless others, commingled, invested, and grew all of these collections and bank accounts to which USAC held legal title, and paid money to countless third parties from this $4.5 billion universal service fund that USAC grew and managed. Counsel, would you clarify one point, and that is that is the BAP incorrect in characterizing that elementary schools and others are recipients of funds from USAC? I don't think so, Your Honor. You don't think that what, that the BAP is incorrect? I don't think that the BAP is incorrect. This is a new position that's being taken here today by counsel. You believe that USAC does make direct payments to elementary schools? I think it does, but I can't tell for sure, Your Honor, because it's never been briefed or discussed below. If you actually look at that USAC's brief, they take the position that they have taken throughout. Page 14, if you look at the subheading, subheading two, they say, USAC serves as a conduit to providers of services to schools, libraries, healthcare providers, and others, designated for FCC support. Frankly, though, Your Honor, I don't think it matters. It really doesn't matter whether or not it's going to directly to the schools or directly going to, uh, uh. Well, it could. I mean, if, if, if, I mean, you've characterized this as a general rule with an affirmative equitable defense of the conduit defense. But if you go back and look at our cases, they're still defining what transferee means. And transferee means dominion, control. However, that gets fleshed out. And it's in that context, it's A to B to C. And then the question is whether or not USAC has the essence of control that our cases have, clearly in a different context, have identified. So if there is a universe of large, readily identifiable entities, which are the carriers themselves, who are the beneficiaries of these disbursements that are being collected by USAC on their behalf, I mean, it's a somewhat different picture than, you know, you see a bunch of little rural school schools where that would be somewhat nonsensical. But, Your Honor, I think it makes a big difference here in terms of the fact that the court developed this test in the context, and it's only been applied to date, in this context, where USAC actually acts, or the defendant acts as a conduit, as an agent for the debtor or an agent for the third party. It's an exception to the general rule that USAC has to establish it meets the criteria. It needs to show that it's an agent, first off. It needs to show that it's taken the money and actually transferred it away. Well, it's an agent in this case, actually, for the FCC, isn't it? I'm sorry? Is it an agent for the FCC? It may be an agent for the FCC, but the FCC is never a recipient of the funds. So the issue here is whether or not USAC has served as an agent for either the debtor or an agent for the recipient of the funds, such that it basically passed them through. Here, Your Honor, there's absolutely no evidence in the record that USAC has acted as a conduit at all, that it's actually passed the money through. Conduit is an oversimplification. That's what I'm taking from our cases. If we hadn't thrown in, if the language hadn't picked up on the colorful illustration of uranium stocks and lottery tickets, then we might not be here. But that's conveying, in a pragmatic, practical sense, what the essence of the control is. And if you apply that, at least we get into this gray area as to whether USAC fits within that at all. But the reason it's important, Your Honor, for USAC to establish that it's a conduit, that it's actually taken the debtor's funds and passed it to a third party, is under USAC's definition, it's not a conduit, regardless of whether or not it's. Well, it may not be, but that may not be the answer to the question. But regardless of whether or not it's passed it through, if the debtor sends the money to USAC, and USAC still has it, let's say there's nothing in the Universal Service Fund other than the money that was sent by the debtor to USAC, and USAC never distributes it, or never gets rid of it in any way. Under USAC's definition, saying that this Dominion test applies regardless of whether or not it's actually a conduit who passes that money on to a specific third party. USAC's not a transferee, and the debtor can't recover its money from anybody, ever, because USAC has the money. It's not a transferee. That's the argument that they made. Well, no, it's a secondary transferee, isn't it? Doesn't it then have defenses, or whatever? No, because they're saying it's not a transferee. Well, no, no, no. Not an initial transferee. Well, I don't know if that's, I think the context in which all of these definitions have arisen have been defining the initial transferee. They certainly make the distinction in the course of the opinion. In Bullion Reserve, they're actually dealing with the subsequent transferee. The defendant Miller actually never, they were trying to decide whether or not he was a subsequent transferee. He never actually received the funds, but that was what they were trying to establish. The point is, is what counsel is trying to do here is it's trying to use this Dominion test to say, look, in order to show that you're a transferee, subsequent, initial, or otherwise, you have to show that you have Dominion or control. And that's not the test. You have this Dominion or control test. If you look at the cases, Your Honor, all of the cases use this test only in the context of somebody who has acted as an agent for the debtor, agent for the third party, and therefore acts as a conduit to pass the debtor's funds through to this particular third party. And the reason that's important is because then you can identify who the third party is, and you know who's actually going to be liable for the funds. Here, that's so radically different from what's happening here because the funds go to USAC, and you can't trace them out of USAC. There's no way to tell whether or not USAC has ever used them. There's no way under USAC's analysis for anybody to ever figure out who actually got the debtor's funds because they've been illegaled. Well, to come back to the point, at least as I understand it, the subsequent transferee has the good faith defense, and that's clearly what Boleyn was focused on. And I thought it went on to, you know, we'll read it again, but I thought it was defining what an initial transferee is. But in order for there to be a subsequent transferee, Your Honor, there has to be an initial transferee. That's true, and that's the question, but that's not inconsistent with USAC. They can say that the initial transferee is, or the tele... Now they're arguing it's the telecommunication companies. But how can they argue that the initial transferee is the telecommunications companies unless they've established that they have actually transferred USAC's funds to those telecommunications companies? They have it, and they can't because they commingle the funds. And that's why it's so important that this court, in looking at this case, makes the distinction between looking at the general rule, which is all that USAC, all that the debtor needs to show in order to establish as a prima facie case that USAC is the initial transferee, versus looking at the conduit defense as an affirmative defense. Because USAC has to be able to establish it actually transferred the debtor's funds, and it can't do it. It can't do it because it's commingled those funds. So that may be, I'd have to do a lot more thinking to agree with you that if we held that they weren't, that they could, in your hypothetical, still hang on to the money. Your Honor, I'd like to reserve a little time if that's possible. Well, you don't have any more time, but if you don't have anything more to say, do we have any questions? You don't need to use it all up. Thank you. Your Honor, just a couple of points. Is his, is counsel's characterization of the structure correct, that there's a presumption that the initial recipient from the debtor is the initial transferee, and that the burden shifts to you all to establish why you aren't, because you don't have the control? No, Your Honor. No, Your Honor. This is not an affirmative defense. The burden is on the trustee under section 550 to establish his claim. And one of the things he has to establish is that the party he is seeking the claim against meets the definition of a transferee. So this concept that somehow we have failed to meet some burden of proof is simply way off the mark.  already found as a matter of fact that we don't have the control necessary to be a transferee. Now, he says we do not have the unfettered discretion. We don't have the right to invest in uranium stocks and in lottery tickets. So as an issue of fact, that's off the table. And the bankruptcy appellate panel agreed. There's no issue of fact about that. So that is simply wrong. Second, the fact that we're obligated to make the disbursements is set forth in the regulations. No, I understand. Well, that I think we're quite familiar with. But I'm still puzzled by this conundrum we have here is that who is the initial transferee? And it seems awkward to say under the circumstances that USAC, which is holding these funds against claims yet to be made in some amount that's within its discretion. Is it not? How much to pay it? Absolutely not within its discretion. OK, there's no discretion whatsoever. PACBEL can come in and it's automatically entitled to 100% on the dollar of what it's spent. PACBEL files a form that sets forth certain information that the FCC has required to basically provide the numbers that USAC then plugs into the formula. It's also been established by the FCC. And it does the arithmetic and it cuts the check. Even if it's out of, what if it's in budget deficit for that? Is there a fiscal year? The FCC, they have a budget that they submit to the FCC. Does that control how much they can pay out in any given year? That controls how much they can pay out in a given year. OK, now how do they decide on that universe of available funds who gets paid and who doesn't? First come, first serve? No, no. How do they decide who gets what? The FCC makes projections about how much money is... I understand they may, but how does... When PACBEL and Verizon submit million dollar bills each and there's only 500,000 in the fund at that point, how does USAC decide who gets what? It doesn't decide. The FCC makes adjustments to the formula so that the numbers match. That's how it's done. I see. USAC has no discretion about this. He said that none of this was argued before. Is that correct? That's not true, Your Honor. As a matter of fact, I did say and I believe it's correct and I believe it's consistent, the payments are made to the providers of services, to schools, libraries, rural health care centers, providers. I meant, that's carriers. It includes carriers and it includes providers of internet services. So PACBEL is providing health care to various places? No, the providers of telecommunication services to those rural health care providers. I thought that was different from what you just said, but you're out of time, so I don't want to prolong it. We'll parse the briefs and figure out. Did you have some more? Actually, I did have just one last question. It's sort of been still nagging at me. Where should the trustee go for the funds? If it can't go to USAC, who does it go to? Does it go to PACBEL? It goes to PACBEL. And PACBEL says, wait a minute, we got the funds along with anybody else. Why don't you go talk to somebody else? It goes to PACBEL. It goes to... Does the trustee have to seek apportionment, depending on how much... Because these dollars cannot be identified. You can't tell where the dollars that IMCOMNet paid into USAC went. You have no way of tracing that. Not those particular... Not that they can identify any particular dollar, by serial number or whatever, but the money that comes in is clearly known, and the percentage of the total revenue that represents that quarter's income that was paid by IMCOMNet, we can determine. Okay. And we can determine how much money was spent on each of those... So we would have to go to USAC's records, find out where USAC paid the money during that quarter, and then the trustee would have to go to those people. It couldn't go to somebody who had been paid earlier in the year or later in the year. If they paid all the money during the third quarter, it couldn't go to somebody who received money during the fourth quarter. There are a number of different programs here. There's schools and libraries, there's rural health care, there's high cost, low income. They have different formulas, and they have different payment cycles. But the principle I'm talking about, which is that you can identify the proportion of the total revenue for a given period that was sourced from IMCOMNet, and the amount that went out to a particular program in that payment cycle can be identified. But we would have to do a portion among all those recipients if you're seeking the money. That's correct. Just as, for example, if one were to deal with an escrow agent who made distributions to the seller and to the real estate agent and to the title company, the trustee would be faced with the same problem. You'd have to go against all three. Okay. Thank you very much. Appreciate the argument on both sides. Case that's argued is submitted, and we'll turn to our last case on calendar, which is United States versus Cervantes. Excuse me, Cervantes Flores.
judges: Browning, Fisher, Bybee